2021 IL App (1st) 170892-U

FIFTH DIVISION
Order filed: June 30, 2021

No. 1-17-0892

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 12 CR 9713 |
| | ) | |
| ISRAEL MELENDEZ, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant's convictions are affirmed over his contentions that the circuit court abused its discretion and violated his right to due process.

¶ 2    Following a jury trial, the defendant, Israel Melendez, was convicted of the first-degree murder of Alexander Mendoza and two counts of the attempted first-degree murder of both Nester Garcia and Miguel Salazar. The defendant was sentenced to consecutive terms of imprisonment totaling 102 years followed by a 3-year term of mandatory supervised release (MSR). On appeal, the defendant argues that: (1) the circuit court erred when it limited his cross-examination of the

codefendant, Francisco Perez, by refusing to allow him to question Perez about the sentence he would have received prior to reaching a plea deal with the State; (2) his due process rights were violated when the police destroyed a gunshot residue (GSR) kit and his clothing; (3) the circuit court abused its discretion when it refused to sanction the State by barring testimony regarding the destroyed evidence; and (4) the circuit court abused its discretion by failing to give an adverse inference jury instruction. For the following reasons, we affirm.

¶ 3     The defendant and Perez were charged by indictment with multiple counts of first-degree murder and attempted murder. Perez pled guilty to conspiracy to commit murder and agreed to testify against the defendant. The charges against the defendant proceeded to a jury trial, during which the following evidence was presented.

¶ 4     Perez testified that, on April 20, 2012, around 8:00 p.m., he was at a corner store at 44th Street and Hermitage Avenue, when he got a call from a Latin Saint gang member named "Wicked," informing him that one of his friends was stuck in rival Two-Six gang territory. After receiving the call, he left the store and walked to his vehicle, a dark green 1993 Nissan Altima with a clear plastic bag over the driver's side window, which was parked at 49th Street and Hermitage Avenue. He stated that he drove southbound on Hermitage Avenue and was stopped in the middle of the 4500 block by the defendant who was wearing a black hoodie. Perez testified that the defendant also told him that one of their friends was stuck in Two-Six gang territory. The defendant got into his vehicle.

¶ 5     According to Perez, the defendant had come from the "honeycomb," an abandoned house where Latin Saints gang members gather and hide items such as guns and drugs. Perez testified that he knew that a "nation gun," one that any gang member could use, was in the honeycomb.

¶ 6       Perez stated that, as he approached the stop light at 48th Street and Damen Avenue, the defendant exited the vehicle, ran behind the vehicle towards the sidewalk and said, "What's up ***. [Two-Six] killer," before firing five to six gunshots at three individuals. Perez testified that he attempted to drive away; however, his car stalled. While he was trying to restart the car, the defendant returned to the passenger seat and placed a gun into his hoodie.

¶ 7       Perez testified that, as he was driving away, a silver car blocked his path. He then, placed his car in reverse, drove around the silver car, and turned south on Damen Avenue. According to Perez, he argued with the defendant about shooting from his car and forced the defendant to exit his vehicle on 50th Street and Wood Street. At that time, the defendant had no injuries.

¶ 8       Perez stated that he returned home at 43rd Street and Honore Street after parking his car in an alley. According to Perez, after his arrest on April 26, 2012, he lied to the detectives about the events that took place on April 20, 2012, because he did not want to implicate himself and wanted to go home. At the time of his arrest, Perez's car was parked in front of his home. He had replaced the clear plastic bag over his driver's side window with a black plastic bag.

¶ 9       On cross examination, Perez admitted that, on January 28, 2016, he pled guilty to a reduced charge of conspiracy to commit murder in this case. He stated that, in exchange for his testimony against the defendant in this case and an unrelated trial, he would receive a term of 15 years' imprisonment to be served at 50%. Perez acknowledged that, if he had pled guilty to first-degree murder, he would have had to serve 100% of that sentence. Defense counsel sought to elicit from Perez the sentence he could have received had he been convicted of all charges against him. However, the State objected, and the trial court sustained the objection.

¶ 10    Eulogio Reyes testified that, on April 20, 2012, he was in a Suburban vehicle with Emilio Palomo and the defendant, but he did not recall who else was in the vehicle or who was driving. Reyes acknowledged that the Suburban passed through the territory of an opposing gang, the "Two-Six" gang. However, he could not remember if, immediately before he entered the vehicle, there was a suspicious car that "blew off" a stop sign at 45th Street and Hermitage Avenue. He stated that did not see any Two-Six gang members on the street "representing" that they were members of the Two-Six gang. Reyes testified that, if such representations were made, "it would have been fatal," or he and his group would have exited the vehicle and chased them.

¶ 11    According to Reyes, the police stopped the Suburban in which he was riding at 43rd Street and Western Avenue and told the occupants that a call had received that they were flashing gang signs. However, Reyes denied that they were flashing gang signs. Reyes stated that the police then took the names of each of the occupants of the Suburban, searched the vehicle, discovering a toy gun inside, and instructed them to park the vehicle.

¶ 12    Reyes testified that, while the Suburban was being driven to a parking space, the occupants were criticizing members of the Two-Six having called the police. Reyes claimed he could not recall where they parked the vehicle. However, he stated that he exited the vehicle at 45th Street and Hermitage Avenue. Reyes denied: that the defendant made certain derogatory remarks about Two-Six gang members; seeing the defendant disappear down the gangway of an abandoned house; seeing Perez drive up to the gangway in a car; or seeing the defendant take the passenger seat of Perez's car after emerging from the gangway.

¶ 13    According to Reyes, when he was questioned by the police on April 26, 2012, he lied because he was scared. He also stated that the detectives "ma[d]e him say" certain things by

threatening him with a "gun charge" and that Detective Cortez told him he was "going down for murder."

¶ 14     Reyes admitted that he agreed to give a videotaped statement to Detective James Adams and Assistant State's Attorney ("ASA") Joe Lattanzio. However, he stated that, at the time he gave his statement, he was scared, wanted to go home, and did not know what he was doing because that was his first interrogation. According to Reyes, he answered the detectives' questions with whatever "came out of the top of [his] head." He also stated that he was on medication for a "head tumor" and migraines, and that he was using marijuana and cocaine, and had been drinking.

¶ 15     Portions of Reyes's videotaped statement were played in court, revealing that Reyes made the following statements. On April 20, 2012, he, the defendant, Miguel Zaragoza, Palomo, Alex Velasquez, and Danny Nunez, entered a Suburban vehicle at 45th Street and Hermitage Avenue. They were looking for a suspicious vehicle they saw drive past a stop sign. While driving towards 47th Street, they saw a member of the Two-Six gang and flashed gang signs at him. The individual that they saw did not respond because, according to Reyes, there were too many people in the Suburban. The Suburban was stopped by the police, and a toy gun was found in the trunk. After the traffic stop, the occupants exited the vehicle at 45th Street and Hermitage Avenue where they made comments about Two-Six gang members "busting out" and being "out on the block." At this point, according to Reyes, the defendant received a phone call and told him that he would "be right back." The defendant then disappeared down the gangway of an abandoned house where a "nation" gun was kept. Reyes stated that, when the defendant returned from the gangway, he got into the passenger's seat of Perez's car, and the car headed towards 46th Street. Reyes stated that he did not see the defendant or Perez again after they drove away. He stated that the defendant was

wearing black clothing, including a black hoodie. Reyes also stated that no one threatened him or made him any promises in exchange for his statement. On cross-examination, Reyes admitted that Detective Adams did not specifically tell him what to say in his statement.

¶ 16     Detective James Adams testified that, on April 26, 2012, he was assisting Detective Carlos Cortez in the investigation of the shooting of Mendoza and interviewed several witnesses including Reyes. He stated that Reyes was cooperative, answered questions, and gave a videotaped statement during which he and ASA Lattanzio were present. According to Detective Adams, Reyes was never handcuffed, the door to the room he was in was open, and he was allowed to use the washroom and eat. Detective Adams denied telling Reyes what to say in his statement and never heard Detective Cortez tell Reyes what to say. He testified that neither he nor Detective Cortez threatened Reyes with a gun charge or a murder charge if he refused to say what they wanted to hear. According to Detective Adams, Reyes never said he was under the influence of alcohol, marijuana, cocaine, or medications at the time he gave his statement.

¶ 17     ASA Jamie Santini testified that he met with Reyes on May 22, 2012, at his office at 26th Street and California Avenue. Reyes was cooperative and agreed to answer questions about the shooting of Mendoza. ASA Santini stated that, before Reyes testified before the grand jury, he went through the questions he was prepared to ask him and discussed the importance of being truthful. ASA Santini testified that, outside the presence of Detective Cortez, he asked Reyes how he had been treated at the police station and Reyes never indicated that he was mistreated or that he was under the influence of drugs or alcohol.

¶ 18     According to ASA Santini, Reyes testified before the grand jury where he swore to tell the truth. ASA Santini read portions of Reyes' grand jury testimony, in which he testified to the

following. Reyes testified that he had been a Latin Saint gang member for four years and described the boundaries of the Latin Saints' territory and the Two-Six gang's territory. On the afternoon of April 20, 2012, he, Zaragoza, Palomo, Velasquez, and the defendant saw a "suspicious" vehicle, which they presumed contained rival gang members, pass through Latin Saints territory. They all entered a Suburban vehicle and drove after the suspicious car. While in the Suburban, they passed through a shared boundary of Two-Six territory and Latin Saints territory where they saw an individual who they thought was a member of the Two-Six gang. They "threw up gang signs" and drove to 43rd Street and Western Avenue where they were stopped by the police because of a call that they had a gun. The police searched the Suburban and found "two replica guns." Reyes testified that he did not know if anyone inside the vehicle had pointed a gun at anyone. After the police recorded the names of each occupant of the Suburban, they were told to park the vehicle. They then drove the Suburban back to Latin Saints territory, and during the ride, the group was laughing and talking about how the Two-Six gang members had reported them to the police. They parked the Suburban at 45th Street and Hermitage Avenue, and everyone exited the vehicle. There, they all continued to criticize the Two-Six gang for having called the police. At this point, the defendant received a cell phone call. After defendant got off the phone, he said he would be back with a "smiley face." According to Reyes, the defendant was wearing a black hoodie sweater and black "Dickies." Reyes testified that the defendant walked to the gangway of an abandoned house where a "Nations" gun was sometimes kept. He stated that the defendant then returned from the gangway and entered a black four-door car with a broken driver's side window, driven by Perez. The car was headed towards 46th Street. While some of the other "guys" were on the "lookout"

for "any shooting that might be going on," Reyes stated that he went home because he "didn't really want to be in that." Reyes testified that he never saw the defendant or Perez again.

¶ 19    Reyes told to the grand jury that he freely and voluntarily agreed to speak with Detective Cortez, ASA Lattanzio, Detective Adams and ASA Santini. He stated that no threats or promises were made to him for giving his grand jury testimony, and that he had been treated "good" since he had been there. Reyes denied having consumed drugs or alcohol before his testimony.

¶ 20    Garcia testified that he was a Two-Six gang member. He stated that, at approximately 6:00 p.m. on April 20, 2012, he was walking on 46th Street and Winchester Avenue when he saw members of the Latin Saints in a vehicle. Words and gang signs were exchanged. Garcia testified that he continued walking to 48th Street and Winchester Avenue where he saw the same rival gang members and again exchanged words and gang signs. According to Garcia, at around 8:00 p.m. that same evening, he and fellow gang members Mendoza and Salazar, were walking on 48th Street towards Damen Avenue. None of the three had a gun that evening. Mendoza directed his attention to a dark, four-door car with plastic on the driver's side window being driven slowly behind them. Garcia testified that, shortly thereafter, he heard a car door open and an individual wearing all black and a black hoodie, "popped out of nowhere," said, "what's up ***. [Two-Six] killer," and started shooting. According to Garcia, he hid behind a parked car. He testified that, after the shooting, the car in which the shooter was riding drove down the middle of 48th Street and turned left on Damen Avenue. Garcia stated that initially he began to chase the car, but returned to aid Mendoza, who was lying on the sidewalk, unresponsive, and bleeding. Garcia stated that the hoodie did not obstruct his view of the shooter's face. On April 26, 2012, he identified the defendant as the shooter in a line-up.

¶ 21     Salazar testified that, on April 20, 2012, he was walking with Garcia and Mendoza on 48th Street towards Damen Avenue, when "[o]ut of nowhere," he saw a car parked on 48th Street and heard someone scream "TSK," or "Two-Six killer." He then heard at least five gunshots but did not see the shooter. While he ran "for [his] life," he saw Mendoza "hit the ground." As he was running, he encountered police officers who took him back to the scene. At this point, he realized he had been shot in the stomach. Salazar testified that he viewed a line-up but did not identify anyone as the shooter. He also testified that neither he, nor Mendoza or Garcia had a gun the night of the shooting.

¶ 22     Delilah Reyes (no relation to Eulogio) testified that, on April 20, 2012, she was driving her car with Verdell Hitchcock as a passenger when she stopped at a red light at 48th Street and Damen Avenue and saw Mendoza walking with a couple of friends she did not know. She also saw a dark, green four-door car with clear plastic over the driver's side window, occupied by two males, stop at the same red light facing opposite direction. Delilah stated that she saw a heavy-set, Hispanic man with a dark blue hoodie and blue pants exit the passenger side of the vehicle holding a gun in his hand. He walked behind the green car and approached Mendoza. Delilah testified that she then heard 3 to 5 gunshots and saw Mendoza fall to the ground. The shooter returned to the green car and the driver attempted to leave. According to Delilah, she tried to block the vehicle with her car, but was unsuccessful. The green car drove around her and headed south on Damen Avenue. She stated that Hitchcock exited her vehicle and approached Mendoza, while she followed the dark, green car until she saw it stop on 50th Street. Delilah testified that she observed the shooter exit the vehicle, and they "locked eyes" before he disappeared into the crowd. At that time, the shooter was not limping, nor did she see blood on his leg. According to Delilah, Mendoza, Garcia, and

Salazar were unarmed during the shooting, and the shooter was not shot. Delilah testified that, on April 24, 2012, she viewed a photo array in which she identified the defendant as the shooter. Two days later, she viewed a line-up and again identified the defendant as the shooter. She stated that she later identified the green car that was involved in the shooting, but at that time, it had black plastic over the driver's side window, instead of clear plastic. Delilah testified that she viewed another line-up where she identified Perez as the driver of the green car involved in the shooting.

¶ 23    Officer Michaelene Johnson testified that she was on patrol on April 20, 2012, at 8:26 p.m. when she heard gunshots coming from Damen Avenue. When she arrived at 48th Street and Damen Avenue, Garcia and Salazar were running towards her car explaining that their friend had been shot. According to Officer Johnson, as she approached 1955 West 48th Street, she saw Mendoza lying on the ground in a pool of blood. She called for an ambulance for both Mendoza and Salazar, who was also wounded. According to Officer Johnson, no weapons were found on Garcia or Salazar.

¶ 24    Detective Carlos Cortez testified that, when he and Detective Sandoval arrived at 48th Street and Damen Avenue at around 8:40 p.m. on April 10, 2012, Mendoza had already been transported to a hospital by ambulance. While at the scene of the shooting, he questioned Garcia, Delilah, Hitchcock, and Salazar, called for forensic investigators, and canvassed the scene for evidence. Upon returning to the police station, he prepared a photo array of nine individuals, including the defendant which he presented the photo array to Delilah. Detective Cortez stated that Delilah identified the defendant as the shooter from the photo array. According to Detective Cortez, his continued investigation revealed that the defendant and five other individuals had been stopped by the police several hours before Mendoza was shot. After the defendant's arrest on April

25, 2012, Detective Cortez had the gang unit contact Zaragoza, Reyes, Velasquez, Palomo and Nunez, the five individuals who were with the defendant and have them come to the police station for questioning.

¶ 25    Detective Cortez testified that he located a green four-door Nissan with black plastic covering the driver's side window parked in the 4500 block of Honore Street. He determined that the vehicle was registered to Perez. On April 26, 2012, Perez was arrested.

¶ 26    Officer Kantor testified that, on April 20, 2012, at 9:05 p.m., he and his partner responded to a call of a shooting victim being treated at the University of Illinois-Chicago (UIC) Hospital. According to Officer Kantor, he spoke to the defendant at the hospital who stated that he had been shot at 4350 South Hermitage Avenue at 8:30 p.m. The defendant offered no description of the shooter and provided minimal details surrounding the incident. Officer Kanter stated that the defendant reported that the shooter exited a black four-door car, fired shots which struck him in the left calf, and then re-entered the vehicle which then drove southbound on Hermitage Avenue. The defendant did not identify any witnesses to the shooting. Officer Kantor testified that he notified detectives of the shooting and sent a police car to canvass the area of the reported shooting for shell casings and blood stains.

¶ 27    Sergeant Michael Corlett testified that he was a detective, on April 20, 2012, and investigated a shooting at 4350 South Hermitage Avenue in which the defendant was a victim (the defendant's aggravated battery case). He stated that he and his partner went to UIC Hospital at 10:15 p.m. and interviewed the defendant who had a gunshot wound to his left calf. The defendant informed them that he had been standing at the curb on 4350 South Hermitage Avenue talking to Nunez when a black four-door car travelling southbound stopped in front of him. The defendant

stated that a male with a black hoodie exited the front passenger seat and fired gunshots. After he began running southbound on Hermitage Avenue, he felt pain in his left calf. The defendant reported that, after he was shot, the car in which the shooter was riding headed southbound on Hermitage Avenue before turning west at 46th Street. The defendant stated that he called his niece, Jocelyn Melendez, who drove him to the hospital. Sergeant Corlett testified that he called for an evidence technician to come to the hospital to collect the defendant's clothing, after which he interviewed Jocelyn and Nunez. He stated that he also went to the scene of the alleged shooting but found no shell casings, blood, bullet holes, or witnesses. There had been no 911 call reporting of shots fired at that location. Sergeant Corlett testified that he gave the defendant his card and told him to call or stop by the police station with any further information. Several hours later, the defendant arrived at the police station. The investigation into the aggravated battery against the defendant was suspended because there was no further information to pursue.

¶ 28 Fernando Reyes, Eulogio's brother, testified that he was outside of his house on 45th and Hermitage Avenue at 8:30 p.m. on April 20, 2012, and did not see or hear shooting on the block.

¶ 29 Evidence Technician Lisa Decker testified that she was assigned to the defendant's aggravated battery case. She stated that she arrived at the UIC Hospital at 11:55 p.m. and took photos of the defendant's injuries, collected his clothing, and performed a gunshot residue test on him.

¶ 30 Forensic Scientist Robert Berk testified that the gunshot residue test performed on the defendant's right hand tested positive for gunshot residue. According to Berk, a positive finding can occur when a person discharges a firearm within six hours of the test or is in the environment of a firearm when it is discharge, either 12-20 feet downrange or 2-3 feet off to the side. Gunshot

residue can also be transferred between people from contact such as a handshake. Berk also testified that a gunshot residue test can yield negative results if the shooter washes their hands, wipes their hands on clothing, or places their hands in their pockets.

¶ 31    Officer Michael Peron, who works at the police department's Evidence Removed Property Section (ERPS), testified that, on September 11, 2015, he destroyed the gunshot residue kit of the test performed on the defendant and the clothes that were recovered from the defendant at UIC Hospital. After conducting a search of the case record division number, he discovered that the investigation into the defendant's aggravated battery had been suspended after no arrest had been made and statute of limitations period had run; therefore, Officer Peron believed he was following proper protocol to destroy the evidence and make room for "incoming property."

¶ 32    On cross examination, Officer Peron admitted that, prior to destroying the evidence, he did not contact the detectives investigating the defendant's aggravated battery case, nor did he look to see if the case was connected to any other cases. He explained that the police department has a computer system in which one case can be linked to another, but that, in this instance, there was no indication that the defendant's aggravated battery case was connected to any other case. He stated that, if there was such an indication, he would not have destroyed the evidence.

¶ 33    Detective Corlett was recalled as a witness. He admitted that he did not try to preserve the gunshot residue test kit and the defendant's clothes because they were only being held for the investigation into the defendant's aggravated battery case. On cross-examination, Detective Corlett admitted that he knew that Detective Cortez was investigating the defendant as a murder suspect but did not alert ERPS that it should not destroy the evidence.

¶ 34    Following the testimony that both the gunshot residue test kit and the defendant's clothes had been destroyed by the police, the defense stated it would seek to have the jury given Illinois Pattern Jury Instruction, Civil 5.01 (3d ed. 1995) (hereinafter IPI Civil 3d), instructing them that they may draw a negative inference regarding the destroyed evidence. The State objected, arguing that, if the jury is given the requested instruction, the State should be able to highlight the fact that any party could have asked the police department to test the forensic evidence, including DNA swabs, gunshot residue swabs, and the defendant's clothing. The defense responded, contending that such an argument on the part of the State would shift the burden to the defendant to prove his innocence.

¶ 35    The circuit court sustained the defendant's objection as to any questioning regarding who could have asked to have the DNA swabs tested. However, with respect to an IPI Civil 3d 5.01 instruction, the circuit court stated that, if the defense requested the instruction, the State could then argue that either party could have had the evidence tested, and it would allow the State to question Detective Cortez on that point. Defense counsel then withdrew the request that an IPI Civil 3d 5.01 instruction be given to the jury.

¶ 36    The medical examiner found that Mendoza's cause of death was a gunshot wound to the chest and that the manner of death was homicide.

¶ 37    The State's exhibits were admitted in evidence, and the State rested its case-in-chief. Thereafter, the defendant moved for a directed verdict of acquittal. The motion was denied, and the defendant commenced its his case.

¶ 38    The defendant testified that, around 6:00 p.m. on April 20, 2012, he and five Latin Saints gang members, Reyes, Zaragoza, Palomo, Velasquez, and Nunez, were near 45th Street and

Hermitage Avenue when they all decided to go for a drive around the neighborhood in a Suburban vehicle. The defendant stated that he was wearing a black, hooded sweatshirt and gray pants while riding as a passenger. The defendant did not know if any of the occupants of the vehicle were flashing gang signs. According to the defendant, the Suburban was pulled over by the police. The officers took the names of all the occupants, searched them, and recovered a toy gun from the vehicle. The defendant testified that Velasquez drove the Suburban back to 45th Street and Hermitage Avenue where all of the occupants exited the vehicle and eventually went their separate ways. At approximately 8:30 p.m., while walking with Nunez on the 4500 block of South Hermitage Avenue, the defendant stated that he noticed a "black figure," saw a flash, and heard popping noises. He ran south on Hermitage Avenue, when he felt a burning pain in his left calf and felt liquid running down his leg. The defendant testified that he did not see where Nunez went, but he noticed a black four-door car speed down Hermitage Avenue, turn right onto 46th Street, and disappear. After realizing he was shot, he called Jocelyn. The defendant stated that Jocelyn picked up her boyfriend, Jose Martinez, and then drove him to the hospital. The defendant admitted that he spoke to the police at the hospital and that the officers took photographs of his injuries, took possession of his clothing, and administered a gunshot residue test. According to the defendant, after he was released from the hospital, the police took him to the police station at 51st Street and Wentworth Avenue where he spent an hour in a locked interrogation room.

¶ 39    The defendant testified that he was arrested on April 25, 2012, as he was leaving Jocelyn's apartment. He stated that he was transported to the police station where he was interrogated by Detective Cortez. He denied firing a gun on April 20, 2012, and explained that the gunshot residue was transferred to him by physical contact with his friend, Palomo. According to the defendant,

Palomo was standing in an alleyway on 45th Street between Hermitage Avenue and Wood Street, when Palomo fired a gun into the air. The defendant testified that, while he was saying goodbye to Palomo, he shook Polomo's hand. He denied entering a boarded-up house on Hermitage Avenue or retrieving a weapon from that house. He also denied: seeing Perez, at any time, on April 20, 2012; entering Perez's car on that day; being at 48th and Damen Avenue that evening; or shooting Mendoza.

¶ 40    On cross-examination, the defendant admitted that, when he was interviewed on April 25, 2012, he did not tell the detectives that Palomo had fired a gun, because he did not want to get Polomo into trouble. He also admitted that he did not tell police officers that he shook hands with Palomo. The defendant testified that he did not tell Detective Cortez that he was riding in the Suburban on the night of the shooting; rather, he claimed he was playing basketball at the park with his son at that time.

¶ 41    Jocelyn testified that, on April 20, 2012, between 7:30 p.m. and 8:30 p.m., the defendant called her and told her he had been shot. She drove to 46th Street and Paulina Street, where the defendant was waiting. She took the defendant to the hospital after picking up her boyfriend, Jose.

¶ 42    Jose testified that, on April 20, 2012, he was walking on 46th Street and Marshfield Avenue when Jocelyn drove up and said the defendant had been shot. He got into the vehicle Jocelyn was driving, and they took the defendant to the hospital.

¶ 43    After the defense rested, the prosecution and the defense made their closing arguments and the jury was instructed. After their deliberations, the jury found the defendant guilty of the first-degree murder of Mendoza, the attempted first-degree murder of Garcia, and the attempted first-degree murder of Salazar. The defendant's motion for a new trial was denied, and he was sentenced

to consecutive terms of imprisonment totaling 102 years to be followed by a mandatory term of 3 years of MSR. This appeal followed.

¶ 44    On appeal, the defendant first argues that the circuit court erred in limiting the scope of his cross-examination of Perez by not allowing questions regarding the penalty attached to the charges Perez would have faced if he did not accept a plea deal with the State. The State maintains, and the defendant concedes, that this argument was not preserved for appellate review and is, therefore, forfeited. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, the defendant contends that we can properly review the issue under the plain error doctrine. *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 45    The plain-error doctrine provides a limited exception to the forfeiture rule by permitting review of unpreserved errors where (1) the evidence is closely balanced and the error threatened to tip the scales of justice against the defendant, or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 121 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). The first step in plain-error analysis is to determine whether error occurred. *Id*.

¶ 46    The trial court is given broad discretion in determining "[t]he latitude to be allowed on cross-examination," and the trial court's resolution of such an issue will not be disturbed on review absent an abuse of that discretion. *People v. Hall*, 195 Ill. 2d 1, 23 (2000). The circuit court abuses its discretion if its decision is "arbitrary, fanciful or unreasonable," or if no reasonable person would agree with the position adopted by it. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 47    A criminal defendant has a constitutional right to confront witnesses against him. *People v. Triplett*, 108 Ill. 2d 463, 474-76, (1985). However, a defendant's confrontation rights are not

limitless. They include the opportunity for "effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Internal quotation marks omitted.) *People v. Kirchner*, 194 Ill. 2d 502, 536 (2000). *People v. Truly*, 318 Ill. App. 3d 217, 225-26 (2000). The circuit court properly precludes any inquiry into an accomplice's specific sentence "when such disclosure would also reveal the potential sentence facing the defendant," and consequently prejudice the State's right to a fair trial. *People v. Brewer*, 245 Ill. App. 3d 890, 892-93 (1993). Such a limitation is appropriate "in cases where the record shows that the defendant was able to conduct an extensive inquiry into the nature of the plea agreement with the State." *Id*. at 893.

¶ 48    Here, the trial court allowed the defendant to cross-examine Perez regarding the details of his plea deal with the State. In so doing, the defendant was able to elicit testimony that, in exchange for his testimony against the defendant in the instant case and in an unrelated matter, the State agreed to him pleading guilty to a reduced charge of conspiracy to commit murder and that he was to receive a sentence of 15 years' imprisonment to be served at 50% instead of the 100% sentence he would be required to serve if he was convicted of first-degree murder. Any further inquiry into Perez's plea deal, specifically, how many years he could have been sentenced to if he were convicted of first-degree murder charge would have unduly prejudiced the State's right to a fair trial as the defendant was also charged with first-degree murder. See *Brewer*, 245 Ill. App. 3d at 892-93. Therefore, based on the record before us, we find that the trial court did not abuse its discretion in limiting the cross-examination of Perez.

¶ 49    Next, the defendant argues that his due process rights were violated under the Illinois Constitution when the police destroyed the gunshot residue test kit and his clothing, which he

asserts was evidence that was essential to his defense. The State argues that the defendant's due process rights were not violated, because the destroyed evidence was not essential to his case and the destruction was not in bad faith. We agree with the State.

¶ 50    Illinois courts have applied the analysis set forth in *Arizona v. Youngblood,* 488 U.S. 51 (1988), when considering issues concerning the destruction of evidence. *People v. Sutherland*, 223 Ill. 2d 187, 235 (2006). In *Youngblood*, the Supreme Court stated that the police do not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution" and held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood,* 488 U.S. at 58.

¶ 51    The defendant argues that, because the destroyed evidence was essential to the outcome of his case, this court should follow *People v. Newberry*, 166 Ill. 2d 310, 315 (1995). In *Newberry*, our supreme court held that the defendant's ability to test the evidence that was destroyed was "essential to and determinative of the outcome of the case," and he did not "have any realistic hope of exonerating himself absent the opportunity to have [the destroyed evidence] examined by his own experts." *Id.* at 315.

¶ 52    We are not persuaded by the defendant's argument that the destroyed gunshot residue test kit and his clothing was material to the outcome of his trial. The record reflects that, in the absence of the gunshot residue test kit, the evidence against the defendant was substantial. Multiple eyewitnesses place the defendant at the scene of the crime, emerging from a dark vehicle with a gun in hand, and shooting the three victims. Even if the gunshot residue test kit had been preserved and if the results were negative instead of positive, this evidence alone would not have impeached

the credibility of the eyewitness testimony. Berk's testimony speaks to the limitations of a gunshot residue test. It can yield negative results if the shooter washes his hands, wipes his hands on clothing, or places his hands in his pockets. Thus, we cannot say that, if the gunshot residue test were negative, it would have exonerated the defendant, nor can we say that the destruction of the gunshot residue kit was determinative of the outcome of this case. Therefore, we find that the destroyed evidence was potentially useful, rather than exculpatory.

¶ 53    Having determined that the destroyed evidence was only potentially useful and not exculpatory, we next address whether the destruction was in bad faith. The record reflects that the gunshot residue test kit was administered in April 2012, after the defendant was seen at the hospital with a gunshot wound. An investigation ensued relating the shooting that resulted in the defendant's injury but was eventually suspended when the investigation yielded no results. Officer Peron testified that in September 2015, he destroyed the gunshot residue test kit and the defendant's clothing pursuant to protocol because the investigation of the case had been suspended, and the statute of limitations had run. Officer Person testified that there was no indication that the gunshot residue test kit and the clothing were related to the instant case against the defendant. He further testified that, if there was any indication in the computer system that the cases were linked, he would not have destroyed the evidence. Absent proof of intentional destruction of evidence with the knowledge that the evidence was relevant to the defendant's murder case, we cannot say that the destruction was in bad faith as negligence does not amount to bad faith. *People v. Gentry*, 351 Ill. App. 3d 872, 878 (2004).

¶ 54    The defendant next maintains that, even if the destruction of the evidence did not amount to a violation of his due process rights, the circuit court abused its discretion by failing to sanction

the State pursuant to Illinois Supreme Court Rule 415 (eff. Oct. 23, 2020), by barring Berk's testimony regarding the results of the destroyed gunshot residue test. The State argues that the court did not abuse its discretion in allowing Berk's testimony because the defendant was not prejudiced by his testimony and a sanction of excluding testimony is a disfavored practice. We agree with the State.

¶ 55     "Sanctions are intended to accomplish the purpose of discovery, not to punish the offending party, and the imposition thereof should not encroach on a party's right to a fair trial." *People v. Scott*, 339 Ill. App. 3d 565, 572 (2003). "For this reason, exclusion of evidence is not favored as a sanction as it does not contribute to the goal of truth seeking." *People v. Hawkins*, 235 Ill. App. 3d 39, 41 (5th Dist. 1992) "Such a severe sanction is appropriate only where it is necessary to cure any prejudice caused by the discovery violation, or where the offending party's violation is determined to be willful and blatant." *People v. Schlott*, 2015 IL App (3d) 130725, ¶ 25. Again, based on our review of the record, we find that the destruction of the evidence in this matter was inadvertent and not willful or blatant. Moreover, we cannot say that the defendant was prejudiced by Berk's testimony about the positive results of the gunshot residue test because, as we previously discussed, in the absence of the gunshot residue test, the evidence against the defendant was considerable; most notably, multiple eyewitnesses placing him at the scene of the crime, shooting the three victims.

¶ 56     The defendant relies on *People v. Koutsakis*, 255 Ill. App. 3d 306, 312 (1993), for the proposition that he is not required show bad faith in the destruction of the evidence or that the evidence was exculpatory in nature for a sanction to be imposed. However, *Koutsakis* does not stand for the proposition that testimony *must* be barred where there is a discovery violation

resulting in missing evidence. Instead, *Koutsakis* reiterates that the circuit court has the authority or *discretion* over the appropriate sanction to impose. Here, the circuit court chose not to impose a sanction, and given the facts of this case, we do not find that the circuit court abused its discretion in failing to impose a sanction.

¶ 57    Lastly, the defendant argues that the circuit court abused its discretion by failing to give the jury an adverse inference jury instruction—IPI Civil 3d 5.01—which would have allowed the jury to infer that the destroyed evidence was adverse to the State's case. The State maintains, and the defendant concedes, that by failing to raise this issue in a post-trial motion, the issue has been forfeited. *Enoch*, 122 Ill. 2d at 186. However, the defendant again argues that the issue should be reviewed under the plain error doctrine or under Rule 451(c) (eff. Apr. 8, 2013).

¶ 58    As previously stated, the plain-error doctrine provides a limited exception to the forfeiture rule by permitting review of unpreserved errors where (1) the evidence is closely balanced and the error threatened to tip the scales of justice against the defendant, or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *Garcia*, 2012 IL App (1st) 103590, ¶ 121. Similarly, Rule 451(c) creates a limited exception to the general forfeiture rule to correct "grave errors" and errors in cases "so factually close that fundamental fairness requires that the jury be properly instructed." *People v. Herron*, 215 Ill. 2d 167, 175 (2005). "Rule 451(c) is coextensive" with the plain-error doctrine, and "we construe these rules 'identically.' " *Id*. Consequently, under either rule, our first step is to determine whether error occurred. See *Garcia*, 2012 IL App (1st) 103590, ¶ 121.

¶ 59    The defendant argues that it was error for the circuit court not to issue an adverse inference jury instruction because the State had a duty to preserve the gunshot residue test kit and his

clothing; therefore, the instruction would have cured the prejudice that he experienced when the evidence was destroyed. We disagree.

¶ 60    IPI Civil 3d 5.01 allows an adverse inference to be drawn from a party's failure to produce evidence if the following elements are satisfied: (1) the evidence was under the control of the party and could have been produced by the exercise of reasonable diligence; (2) the evidence was not equally available to an adverse party; (3) a reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed it would have been favorable to him; and (4) no reasonable excuse for the failure has been shown. *Anderson v. Chesapeake & Ohio Ry. Co.*, 147 Ill. App. 3d 960, 972 (1986). Whether the adequate foundation was provided is not a matter for the jury to decide but is instead a threshold issue "within the province of the trial judge." *Brown v. Moawad*, 211 Ill. App. 3d 516, 531 (1991). "The decision of whether to tender IPI Civil 3d 5.01 to the jury is within the sound discretion of the trial court, and that decision will not be reversed absent a clear abuse of discretion." *Dunning v. Dynegy Midwest Generation, Inc.*, 2015 IL App (5th) 140168, ¶ 84, 33.

¶ 61    The record reflects that the gunshot residue test kit and defendant's clothing were equally available to both parties and nothing presented the defendant from having them tested or reviewed during the time between the defendant's arrest in 2012 and the destruction of the evidence in 2015. Officer Peron provided a reasonable excuse for the destruction of the evidence; namely, the statute of limitations had run on the case for which the evidence had been collected, the evidence was destroyed pursuant to protocol in order to make room for more evidence, and there was no indication that the case for which the evidence was collected was related to the present case. In

light of these facts, we are unable to find that the trial court abused its discretion by declining to give the jury the IPI Civil 3d 5.01 instruction.

¶ 62    Based upon the foregoing analysis, we affirm the defendant's convictions for first-degree murder and two counts of attempted first-degree murder.

¶ 63    Affirmed.