2024 IL App (1st) 230180-U

No. 1-23-0180

Second Division
April 23, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | No. 13 CR 15605 |
| v. | ) ) | |
| JOSE G. MARTINEZ, | ) ) | Honorable Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in summarily dismissing defendant's initial postconviction petition because his appellate counsel was not ineffective for failing to raise meritless claims on direct appeal that (1) his due process rights were violated by the destruction of oral swabs and (2) trial counsel was ineffective for eliciting testimony and making a closing argument that damaged defendant's alibi defense.

¶ 2    Following a jury trial, defendant-appellant Jose G. Martinez was found guilty of first degree murder and sentenced to 40 years' imprisonment. On direct appeal, this court affirmed the

trial court's judgment, holding that the court did not err in refusing to issue an involuntary manslaughter instruction. *People v. Martinez*, 2021 IL App (1st) 190408-U. Defendant now appeals from the trial court's summary dismissal of his initial postconviction petition, arguing that the trial court erred in dismissing his initial postconviction petition where he presented a gist of a constitutional claim that (1) his due process rights were violated by the destruction of the oral swabs; (2) trial counsel was ineffective for damaging defendant's alibi defense and eliciting testimony that bolstered the State's case; and (3) appellate counsel was ineffective for failing to raise these issues on direct appeal. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     Defendant was charged by indictment with two counts of first degree murder, with count I charging him with intentionally or knowingly strangling and killing Bozena Staggs with his hands (720 ILCS 5/9-1(a)(1) (West Supp. 2009)) and count II charging him with strangling and killing Staggs knowing that the act created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West Supp. 2009)). Defendant filed a notice of an alibi defense, alleging that he was driving with his then-wife to work at the time of Staggs's death.

¶ 5     Prior to trial, on October 19, 2016, defendant filed a motion to compel forensic DNA testing on swabs taken from Staggs's mouth that revealed the presence of "blood like stains." The swabs were collected during the medical examiner's examination of Staggs's body and remained in the custody of the Chicago Police Department. The police had also collected DNA samples from several men who were known to have had sexual relations with Staggs around the time of her death. The DNA from the oral swabs were never tested against those men's DNA profiles. Defendant requested this testing to be conducted. According to defendant, the blood found in

Staggs's mouth could have resulted from Staggs biting her assailant's hands and could be connected to someone other than defendant, which would tend to prove his innocence.

¶ 6    On December 6, 2016, the trial court ordered that the oral swabs be tested. However, on January 6, 2017, the State informed the court that the oral swab had been inadvertently destroyed.

¶ 7    On February 7, 2017, defendant filed a motion to dismiss the indictment based on the destruction of the oral swabs, arguing that the State had a duty to preserve the evidence. The motion asserted that the State filed an answer to discovery in March 2014, which stated that any property inventoried by the Chicago Police Department was available for inspection. The oral swabs were inventoried by police. The State's investigation showed that the oral swabs were destroyed in September 2014. Defendant also argued that Chicago Police Directives did not authorize the destruction of the evidence.

¶ 8    In its response, the State provided the following information regarding the destruction of the evidence:

> "On October 12, 2013, Detective Weber picked up from ERPS, 32 inventories that were inventoried in this case. The 32 inventories were turned over to the Cook County State's Attorney's office to be copied for the defense. The oral swabs were not one of the inventories requested by the State, nor were they turned over to the State's Attorney's office. On October 24, 2013, Detective Weber removed the hold for those 32 inventories. Detective Weber inadvertently took the hold off of 2 additional inventories. One of those inventories was *** the oral, rectal and vaginal swabs. On September 11, 2014, the oral, rectal and vaginal swabs were destroyed. The swabs were not categorized as having been from a homicide."

¶ 9    On April 26, 2017, the court denied defendant's motion, finding that the destruction of the evidence occurred due to an unintentional clerical error and had not been in bad faith.

¶ 10    At trial, Daniel Kobylanski testified that he was Staggs's brother. According to Kobylanski, around Thanksgiving in 2010, Staggs abused crack cocaine and worked as a prostitute.

¶ 11    David Mathews testified that he walked his dog down an alley near West Homer Street and Kedzie Avenue, in Chicago, around 7:30 a.m. on Saturday, November 27, 2010. Mathews saw a body in the alley, and approached to see if the person was breathing; she was not, and Mathews did not touch her. Her pants were around her ankles, her neck was discolored, and her eyes were open. Mathews went home and called 911. An ambulance arrived, which he directed to the alley. On cross-examination, Mathews testified that he did not recall the temperature that day but stated it was cold.

¶ 12    Chicago police detective John Valkner arrived at the scene around 9 a.m. At that point, Staggs had been pronounced dead. Valkner's inspection of the scene revealed the following. Staggs had bruising and redness around the neck and behind the right ear. She was wearing a green shirt underneath a white T-shirt, and her jeans and underwear were pulled down to her knees. She wore dirty socks with no shoes. No personal items were found on her person or in the area. She had long, natural fingernails and the forensic investigators had placed bags over her hands to protect any evidence under her nails. Material was later collected from underneath her fingernails, as well as samples of Staggs's blood and DNA. Valkner observed lividity—a purplish internal pooling of blood—on the back of her midsection and buttocks and gravel stuck to her body.

¶ 13    Dr. Michael Eckhardt, an assistant Cook County medical examiner, testified that he did not autopsy Staggs's body, but he reviewed the case file and photographs. Her body was examined at 8 a.m. on November 28, 2010, almost a full day after it had been brought to the office. He testified

that, when Staggs's body arrived, rigidity, or rigor mortis, and lividity were fixed, which generally take 8 to 12 hours or 6 to 12 hours, respectively. He confirmed that both may appear in as little as 30 minutes. He further testified that the timing is based on many factors, including temperature. On cross-examination, he testified that cold temperatures could slow down the process of rigor mortis. He also confirmed that an individual who had just died would not show signs of rigor mortis immediately.

¶ 14    Rufus Burks, Jr., Staggs's boyfriend at the time of her death, testified that, in November 2010, Staggs used cocaine and sold sex for money. On November 27, 2010, approximately 3 a.m., he arrived home after working the afternoon and night shift at a pizzeria. Staggs was there when he arrived but she left within an hour. Staggs then returned and left a second time. Burks was awake when Staggs returned and then left a third time around 5 or 6 a.m. He was not aware of what she was wearing when she left the last time, and he assumed that she was leaving that night to work as a prostitute. Around 10 or 11 a.m., Burks called and texted her but could not reach her. He went to work on November 27 and continued his attempts to contact her. While he was at work on November 28, detectives arrived and informed him that Staggs had died. On November 30, Burks went to the police station, was interviewed, and agreed to submit a DNA sample. During his interview, Burks showed the detectives phone numbers of clients Staggs had contacted using his cell phone.

¶ 15    Chicago police detective Ruben Weber testified that he received Staggs's name from the medical examiner's office. Weber learned from Burks and Staggs's family what she did for money. Staggs's cell phone had not been located. Weber obtained her phone number, subpoenaed the phone company for her call logs, and attempted to contact every person who had contacted Staggs around the time of her death. A number of men went to the police station for interviews and

provided DNA samples. No evidence connected any of these men to the crime scene or Staggs's death, and Weber ran out of leads in April 2011.

¶ 16    The case went cold until 2013, at which time Weber learned that defendant's DNA was associated with the DNA found under Staggs's fingernails. Weber met defendant at the police station on July 15, 2013, and defendant agreed to submit a DNA sample.

¶ 17    The State entered several stipulations. First, an evidence technician would testify that he collected a buccal swab from defendant and the swab was submitted for DNA analysis. Second, a Chicago police officer would testify that he collected Staggs's clothing, fingernail clippings, swabs, and blood card from the medical examiner's office and transported them to the police department's forensic services division. Third, a forensic scientist would testify that she received and preserved one of the buccal swab standards collected by Weber. Fourth, a different forensic scientist would testify that she conducted DNA analysis on Staggs's blood sample, some of the buccal swabs collected by Weber, and the material collected from under Staggs's fingernails, and found a partial male DNA profile from that material. The men whose buccal swabs the scientist analyzed, including Burks, were excluded as possible donors of the male DNA profile. Lastly, a different forensic scientist would testify that, in May 2013, a DNA database detected an association between the partial male DNA profile identified from Staggs's right-hand fingernails and defendant, and the scientist requested an additional standard from defendant for confirmatory analysis.

¶ 18    Cynara Anderson, a forensic science administrator with the Illinois State Police, testified as an expert in forensic DNA analysis. Anderson compared the DNA data generated from the material under Staggs's fingernails with a standard collected from defendant and determined that defendant could not be excluded from contributing to a mixture of DNA found under Staggs's

fingernails. Approximately 1 in 448 billion black, 1 in 270 billion white, and 1 in 11 billion Hispanic individuals could not be excluded from contributing to the DNA profile identified in the sample from the fingernails on Staggs's right hand. Approximately 1 in 8 black, 1 in 17 white, or 1 in 3 Hispanic individuals could not be excluded from contributing to the sample from Staggs's left hand. Anderson explained that the profile from the left hand was more common because more DNA information was present in the sample from Staggs's right hand.

¶ 19 Chicago police detective Jacinto Gonzalez testified that he and Weber interviewed defendant at the police station on July 15, 2013. The interview, which lasted over an hour, was videotaped and that recording was submitted to the court. Gonzalez described portions of the interview and corresponding video clips were played for the jury.

¶ 20 In the recording, Gonzalez advises defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and defendant indicates that he understands his rights. The detectives inform defendant that his name arose in an investigation from November 27, 2010. Weber asks if defendant is familiar with the name of the victim and shows defendant a picture of Staggs. Defendant denies recognizing the victim by name or photo. Weber informs defendant that Staggs is a prostitute. Defendant denies having sexual intercourse with her but discusses an encounter with a different prostitute. He also informs the detectives of his anger issues, stating that he gets mad quickly. Defendant again denies ever seeing Staggs and states he does not know why he would be associated with Staggs in November 2010. After Weber shows defendant additional photos of Staggs, defendant once again denies recognizing her.

¶ 21 However, after first stating he "might" have seen her before, defendant then states that at least two years earlier, he once saw Staggs near Armitage Avenue and Sacramento Avenue or Humboldt Boulevard, and at that time, she asked him for a cigarette. Weber informs defendant that

Staggs was found dead on November 27, 2010, near that same area, and later states that they had evidence that defendant was with Staggs on that date. He continues to deny anything other than giving her a cigarette.

¶ 22    Eventually, defendant admits that he had sexual intercourse with Staggs on three occasions, the last occurring in August 2010. Each time, he picked her up from Armitage and Sacramento. He claims that they never exchanged names or phone numbers. On that last occasion, Staggs instructed defendant to pull into an alley, and after they had sex in the backseat, defendant paid her $20. According to defendant, Staggs argued with defendant because she wanted more money and she scratched defendant, who either pushed her with his car door or punched her. Defendant then entered his car and, as he was driving away, he observed Staggs getting up off the ground. At this point, Weber asks if defendant choked her, which defendant denies.

¶ 23    Defendant then admits that Staggs had not gotten up when he left but he thought she was alive. He states that Staggs scratched his back, head, and face. Gonzalez offers that defendant held Staggs down, and defendant confirms that he grabbed her and demonstrates a choking motion with his hands. Gonzalez performs the same gesture, which defendant repeats while stating that he grabbed Staggs and she stopped moving. Defendant states that he did not use all of his strength and makes the choking motion again. Gonzalez asks if it was "a rage thing" and whether defendant "snapped," and defendant agrees. Defendant then states that he thinks the incident actually took place on November 27, 2010, because November 26 is his daughter's birthday and he was always with his family on that day, and the incident took place sometime around midnight. Defendant confirms that he provided the detectives with the absolute truth.

¶ 24    Next, on the recording, everyone in the room stands, and defendant states he does not remember whether he punched Staggs or hit her with the car door but she hit a garage door and

then fell. Defendant states, "that's when I," and kneels, makes a choking motion, and says he did that until Staggs stopped moving. Defendant states he did not know he killed Staggs and thought she fainted or entered a coma. When asked if she felt "lifeless," defendant agrees, stating that she moved slightly and he jumped on her and grabbed her; defendant again makes a choking motion and states that Staggs stopped moving. Defendant repeats that he did not think he used all his strength. The next morning, defendant told his wife that the scratches on his body were from boxes falling on him at work.

¶ 25    Gonzalez further testified that the location at which defendant stated he picked up Staggs was approximately five blocks from where her body was found. He confirmed that no one told defendant that Staggs died by strangulation, that a person's DNA had been found under her fingernails, or that her body was found in an alley. After the interview, defendant consented to give a buccal swab DNA sample.

¶ 26    On cross-examination, Gonzalez agreed that the first time anyone mentioned choking was when Weber asked defendant if he had choked Staggs, and he agreed that he motioned in front of his body before defendant made a choking motion. Gonzalez further confirmed that their statement to defendant that they had proof that defendant was with Staggs on November 27, 2010, was a lie because the DNA evidence did not actually establish that he was with her on that date.

¶ 27    The defense called Nathan Tomlinson, who testified that he lived on the 3100 block of Homer and he let his dog into his fenced backyard between 5 and 5:15 a.m. on November 27, 2010. Tomlinson did not hear anything or see anybody in the alley at that time. Tomlinson saw Staggs's body when the detectives arrived later in the morning. According to Tomlinson, there was a streetlight approximately 20 feet from Staggs's body.

¶ 28    Alexander Caraballo, an ambulance commander with the Chicago Fire Department, testified that around 7:32 a.m. on November 27, 2010, he and a partner were dispatched to the 3100 block of Homer for a report of an unresponsive person. Caraballo arrived at the alley and noticed a woman on her back, with her pants around her ankles. Caraballo checked for signs of rigor mortis and lividity. Caraballo testified that, based on his experience and training, rigor mortis generally sets in after a couple of hours after death and lividity begins to set in about twenty minutes after death. However, he also explained that the timing of rigor mortis was not specified in his training and that every individual might differ. Caraballo found both present in the victim and reported the situation to a hospital, after which she was pronounced dead, and he had no more contact with the body.

¶ 29    On cross-examination, Caraballo confirmed that he did not have the same training or experience as a medical examiner as to rigor mortis. He also agreed that lividity can begin instantly after death "once the blood stops pumping through the body." He further agreed that there "could" be other factors causing stiffness in muscles and that freezing temperatures could cause muscles to stiffen.

¶ 30    Susana Sanchez testified that she was married to defendant for nearly 10 years, but they were divorced at the time of trial. Their oldest daughter, whose birthday was November 26, had died, and every year on that date the family would visit her grave, unless they had to work, in which case they would go later or on another day.

¶ 31    Sanchez testified that she worked on November 27, 2010, and defendant always drove her because she did not have a driver's license and she is afraid of driving. Sanchez's place of employment had offices in East Dundee, Elgin, Arlington Heights, and Elk Grove Village, but Sanchez mostly worked in East Dundee. She and defendant would wake around 5:30 a.m., and the

drive from their home on the 2700 block of West Melrose Street, in Chicago, took 1½ to 2½ hours, depending on traffic. Defendant was always home when Sanchez awoke. Sanchez recalled seeing scratches on defendant once but did not remember when.

¶ 32    On cross-examination, Sanchez testified that she and defendant stopped at McDonald's for breakfast every day on the drive to her work. She worked on November 26, 2010. She did not recall if they went to the cemetery that day. Sanchez did not recall whether defendant was present when she awoke on November 27 but stated that he was always there when she awoke. Sanchez spoke with an investigator on March 1, 2018, but denied stating that she did not remember whether defendant was in bed when she awoke on November 27, 2010. She confirmed that her recollection is based on their routine but she did not have any specific recollection as to what occurred on November 27, 2010. She also testified that she does not recall whether defendant had a license at that time.

¶ 33    She further testified that the scratches she once saw on defendant were on his upper arm. The State and the court noted that Sanchez pointed to the back of her left shoulder. The scratches resembled paper cuts or box cuts. Sanchez asked where he got them and defendant stated that boxes fell on him at work. Sanchez denied telling the investigator that they resembled fingernail scratches.

¶ 34    On redirect examination, Sanchez identified her work schedule and stated that it showed no record of her working November 26, 2010. On November 27, 2010, she punched in at 7:40 a.m. and punched out at 12:49 p.m.

¶ 35    Defense counsel entered a stipulation that a records custodian for Sanchez's employer would testify that Sanchez worked at the employer's facility in Elgin, Illinois. On November 27,

2010, Sanchez punched in at 7:40 a.m., punched out at 12:49 p.m., and did not clock in again until November 30.

¶ 36    Kevin Foster, an employee with the Illinois Tollway, testified that, when a person drives through a toll plaza with an I-PASS transponder, the transponder logs the transaction in a database. Foster identified an account history report in defendant's name which showed transactions on November 27, 2010. The report showed that an I-PASS registered to the account went west on Interstate 90 through the Devon Avenue toll plaza at 6:52 a.m., west on Interstate 90 through the Route 25 toll plaza at 7:20 a.m., east on Interstate 90 through the Route 25 toll plaza at 7:44 a.m., and east on Interstate 90 through the River Road toll plaza at 8:06 a.m. The tollway photographs each vehicle and license plate when it passes through a toll plaza, but the images are discarded unless the driver does not pay the toll.

¶ 37    Defendant testified that in 2010, he had worked at UPS for approximately four years. He drove Sanchez to work every day, five or six days a week, and the drive would take 1 to 1½ hours. He later worked from 6 p.m. until 11 p.m. After work, he drove straight home.

¶ 38    He testified that he did not work on November 26, 2010, and he went with his family to the cemetery to visit his daughter's grave. That night, he lied to his wife, claiming that he had to go to work, but instead, he drove around until he saw Staggs near Armitage and Sacramento. According to defendant, she was wearing nice clothes, specifying that she was wearing a skirt and was not wearing socks. They came to an agreement regarding an exchange of sex for $20. He testified that he had done this with Staggs on two other occasions where he paid her $25 in exchange for sex. Staggs entered his car and directed defendant to an alley near a factory. It was around midnight at this point. They both moved to the backseat of his car and had sexual intercourse. He gave her $20 and they both exited the backseat of the car. She asked for more

money and she attempted to take his wallet. At one point, Staggs scratched defendant with her nails, and the State and court noted that he indicated below his right ear. When he opened the front door of the car, he accidentally hit her and she hit a garage door and fell to the ground. Defendant testified that he also may have hit her with his arm but he denied punching her. He entered his car, and in his mirror, defendant saw Staggs getting up as he drove away. Defendant went home. On the morning of November 27, defendant awoke around 5 a.m. and took Sanchez to work. On the way, they stopped at McDonald's for breakfast. On the highway, he used his tollway pass. After dropping her off, he drove home and he went to work that night.

¶ 39    In July 2013, defendant was interviewed by detectives at the police station. He admitted that he was with Staggs on November 27, 2010, but did not know he was accused of killing her and denied believing that he had killed Staggs. Towards the end of the interview, Gonzalez discussed choking and demonstrated a choking motion which defendant repeated in the interview and in court. Defendant testified that he demonstrated the choking motion in the interview because he had woken at 4 a.m. that morning, was tired, stressed, wanted to leave, and needed his diabetes medicine, which he received at a hospital after the interview. Defendant denied actually choking Staggs.

¶ 40    On cross-examination, defendant testified that, if traffic was light, it took 30 or 35 minutes to travel from their home to the first toll plaza. Defendant confirmed that, on the night in question, Staggs gave him "attitude" but denied being angry. Defendant denied choking Staggs but admitted that he told the detectives he got on top of her after she fell and put his hands around her throat. Defendant stated that he "followed" Gonzalez in making the choking gesture after Gonzalez did it first. While defendant kneeled and demonstrated the choking motion, the detective stated he would not get on the ground. Defendant denied kneeling in the alley and stated he was tired and went

along with what the detectives said. Defendant admitted that he told the detectives that Staggs fainted and that he put his hands around Staggs's throat until she entered a coma and did not move, and that the detectives had not told him to say those things. However, he testified that those statements were not true.

¶ 41    Defendant agreed that, during the interview, the detectives asked if he wanted food and repeatedly asked if he was okay or needed anything, and that he responded each time that he did not need anything and he was fine. Defendant stated that the time stamp on the video was incorrect and that the interview did not end until after 6 p.m., when he was scheduled to take his diabetes medication and that he received his medication at a hospital around 7:30 or 8 p.m. Defendant confirmed that he told the detectives his diabetes was not "that bad" as long as he was careful of what he ate, and he was tired but not hungry or thirsty during the interview.

¶ 42    In rebuttal, the State called Joseph Thomas, an investigator with the State's Attorney's Office, who testified that he interviewed Sanchez on March 1, 2018. During the interview, he asked Sanchez if she remembered whether defendant was home when she awoke on November 27, 2010, and Sanchez responded that she was "pretty sure" he was but could not be certain because so much time had passed. He also asked Sanchez if defendant had ever come home with scratches on his body, and she responded that one night he had scratches on his back and defendant told her that they were from boxes falling on him at work. When asked if she thought the scratches appeared to be caused by boxes, she answered that they did not and rather, they resembled paper cuts.

¶ 43    Thomas also drove from the 3100 block of Homer to defendant's and Sanchez's address on the 2700 block of Melrose, which was 2.2 miles away and took seven minutes. Thomas then drove from the home to the Devon toll plaza, which was 11.4 miles away and took approximately 14 minutes. Thomas completed the drives on a Saturday around 6:30 a.m. Thomas then returned

to the 3100 block of Homer and repeated the drives around 7:30 a.m. The drives took the same amount of time.

¶ 44     Following closing arguments, the jury found defendant guilty of first degree murder. Defendant filed a motion for a new trial, which the trial court denied. Following a sentencing hearing, the court sentenced defendant to 40 years' imprisonment. Defendant filed a motion to reconsider his sentence, which was denied.

¶ 45     On direct appeal, defendant argued that the trial court erred in declining to instruct the jury on involuntary manslaughter. This court affirmed, holding that the trial court did not abuse its discretion in refusing to issue the requested instruction. *People v. Martinez*, 2021 IL App (1st) 190408-U.

¶ 46     On November 1, 2022, defendant filed an initial postconviction petition, arguing that the trial court should vacate his conviction and grant him a new trial because (1) his due process right to a fair trial was denied when the State destroyed the DNA evidence found on the victim, (2) he was denied his constitutional right to effective assistance of trial where counsel introduced evidence that undermined his alibi defense, and (3) he was denied his constitutional right to effective assistance of appellate counsel for failing to raise the prior two issues on direct appeal.

¶ 47     On January 6, 2023, the trial court dismissed the petition, stating that the claims failed because they were not brought on direct appeal and the claims also failed on the merits.

¶ 48     This appeal followed.

¶ 49                                    II. ANALYSIS

¶ 50     On appeal, defendant argues that the trial court erred in dismissing his initial postconviction petition where he presented a gist of a constitutional claim that (1) his due process rights were violated by the destruction of the oral swabs; (2) trial counsel was ineffective for damaging

- 15 -

defendant's alibi defense and eliciting testimony that bolstered the State's case; and (3) appellate counsel was ineffective for failing to raise these issues on direct appeal. He requests that this court reverse the trial court's dismissal and remand his petition for second stage proceedings.

¶ 51                                    A. The Postconviction Act

¶ 52    The Act provides a method for a criminal defendant to collaterally attack a conviction by asserting that it resulted from a substantial denial of his constitutional rights. 725 ILCS 5/122-1 (West 2022); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 53    A postconviction proceeding in a noncapital case has three stages. *Hodges*, 234 Ill. 2d at 10. At the first stage, as in this case, a petition need only state the "gist" of a constitutional claim (*id.* at 9 (citing *People v. Porter*, 122 Ill. 2d 64, 73 (1988)), and a trial court may summarily dismiss a petition within 90 days if it "determines the petition is frivolous or is patently without merit" (725 ILCS 5/122-2.1(a)(2)). A petition is frivolous or patently without merit when it "has no arguable basis in either fact or law," such as where it is "based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 11-12, 16.

¶ 54    Section 122-2 requires that a postconviction petition must "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2. At this early stage of the proceedings, the trial court need only determine whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Act. *People v.*

*Coleman*, 183 Ill. 2d 366, 380 (1998). The court is not permitted to engage in any fact-finding or credibility determinations. *Id.* at 385. We must accept all well-pleaded factual allegations of a postconviction petition and its supporting evidence as true unless they are positively rebutted by the record. *Id.* at 382. We review *de novo* the summary dismissal of a defendant's postconviction petition. *People v. Allen*, 2015 IL 113135, ¶ 19. The trial court's judgment is reviewed, not the reasons cited, and that judgment may be affirmed on any basis supported by the record. *People v. Lee*, 344 Ill. App. 3d 851, 853 (2003).

¶ 55                          B. Ineffective Assistance of Appellate Counsel

¶ 56    Preliminarily, we note that defendant's claims of a due process violation and ineffective assistance of trial counsel could have been raised on direct appeal and they were not, which implicates the doctrine of forfeiture. See *English*, 2013 IL 112890, ¶ 22. However, the doctrine of forfeiture may be relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record. *Id.* Because defendant has sufficiently alleged that his appellate counsel was ineffective for failing to raise these claims on direct appeal, these claims are not forfeited.

¶ 57    Claims of ineffective assistance are governed by the familiar two-prong test set forth *in Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 138. Under this test, a defendant must first show that his counsel's performance fell below an objective standard of reasonableness. *Id.* Second, the defendant must establish prejudice by showing that there is a reasonable probability that the result of the proceeding would have been different but for his counsel's deficient performance. *Id.*

¶ 58    "The *Strickland* standard applies equally to claims of ineffective appellate counsel, and a defendant raising such a claim must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). Appellate counsel does not have an obligation to brief and argue every conceivable claim on appeal, and a defendant cannot establish prejudice based on appellate counsel's failure to raise a meritless issue. *People v. Pingelton*, 2022 IL 127680, ¶ 64. As such, if the underlying claim would not have been successful on direct appeal, then " 'there is no arguable legal basis' for defendant's claim of ineffective assistance of appellate counsel, and dismissal is 'proper.' " *People v. Randall*, 2021 IL App (1st) 191194, ¶ 66 (quoting *Petrenko*, 237 Ill. 2d at 501-02). We therefore address each underlying claim in turn.

¶ 59                          1. Due Process Violation

¶ 60    Defendant contends that his due process rights were violated when the oral swabs of the victim's mouth were destroyed prior to trial. He claims that he was denied the opportunity to have the blood-like stains from the oral swabs tested to determine whether there was DNA present which belonged to someone other than himself or Staggs. In response, the State asserts that this claim lacks an arguable basis in fact and law because the swabs were not destroyed in bad faith and they were not "potentially useful" to his case.

¶ 61    Due process requires that prosecutors turn over all potentially exculpatory evidence to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "The destruction or loss of evidence by the State violates due process only under certain circumstances." *People v. Sandridge*, 2020 IL App (1st) 173158, ¶ 22. Courts have distinguished due process claims between instances where the lost or destroyed evidence is materially exculpatory and where it is only potentially useful. *Illinois v. Fisher*, 540 U.S. 544, 567 (2004); *People v. Sutherland*, 223 Ill. 2d 187, 235 (2006). Where the

missing evidence is materially exculpatory, a due process violation has occurred and whether the evidence was lost in bad faith is irrelevant. *Sutherland*, 223 Ill. 2d at 235. However, in *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), the United States Supreme Court refused to find that the due process clause imposes a duty to preserve all evidence regardless of its evidentiary significance. Rather, where the missing evidence is merely potentially useful, the State's failure to preserve the evidence is only considered a due process violation where the defendant can affirmatively establish bad faith on the part of the State. *Id.* at 57-58; *People v. Stolberg*, 2014 IL App (2d) 130963, ¶ 28.

¶ 62    In the case before us, where the destroyed evidence, *i.e.* the oral swabs, was never tested, the evidence cannot be classified as materially exculpatory, particularly where it was never even confirmed that there was blood on the swabs. The parties instead dispute whether the evidence is potentially useful and whether there was bad faith on the part of the State. Because we conclude that defendant cannot show bad faith, we need not address the potentially useful element.

¶ 63    "Bad faith 'implies a furtive design, dishonesty or ill will.' " *People v. Nunn*, 2014 IL App (3d) 120614, ¶ 17 (quoting *People v. Danielly*, 274 Ill. App. 3d 358, 364 (1995)). In assessing the State's duty to preserve evidence, the court should consider "whether the State acted in good faith and per its normal practice and whether the evidence was significant in [the] defendant's defense and was such that comparable evidence could not be obtained by other reasonable and available means." *Id.*; see also *Danielly*, 274 Ill. App. 3d at 364 (the defendant failed to affirmatively demonstrate bad faith where there was no evidence that the police acted with a sinister motive or ill will). Further, "[m]ere negligence or sloppiness is not bad faith." *People v. Gentry*, 351 Ill. App. 3d 872, 878 (2004).

¶ 64    In the instant case, the DNA evidence, consisting of the oral swabs of the victim's mouth which allegedly would show the presence of "blood like stains," was placed in the custody of the

Chicago Police Department. In March 2014, the State, in its answer to discovery, averred that it may or may not use certain evidence at trial, including the oral swabs at issue here, and stated that such evidence would be available to the defense for inspection. However, after the trial court granted defendant's motion to test the oral swabs, the State informed the court that the evidence had been inadvertently destroyed. According to defendant, the destruction of the evidence violated Illinois statute as well as Chicago Police Directives. See 725 ILCS 5/116-4(a) (requiring the law enforcement agency to preserve any evidence that is reasonably likely to contain forensic evidence); Chicago Police Directives, General Order 07-01 (eff. April 14, 2015) https://directives.chicagopolice.org/#directive/public/6399 (stating that holds may be released "when the property is no longer needed as evidence").

¶ 65     We do not disagree with defendant that the destruction of the evidence was contrary to state statute and police directives. However, that does not establish that the State acted in bad faith. Rather, the State explained to the court that the evidence was incorrectly labeled and thus it was erroneously included in the release of a hold and subsequently a routine purge. With this backdrop, we cannot say that the loss of the oral swabs amounts to ill will on the part of the police; rather, we would consider it negligence at best. See *Youngblood*, 488 U.S. at 337-38 (finding that the police's failure to preserve the evidence could be described as negligence but there was no suggestion of bad faith); see also *People v. Melendez*, 2021 IL App (1st) 170892-U (finding no bad faith where there was no proof of "intentional destruction of evidence with the knowledge that the evidence was relevant to the defendant's murder case").

¶ 66     We also disagree with defendant that the decision in *People v. Sandridge*, 2020 IL App (1st) 173158, is instructive here. In *Sandridge*, the defendant claimed that a detective's failure to preserve his field notes after receiving a subpoena for those notes was a due process violation. *Id.*

¶ 21. The defendant admitted that the notes were only potentially useful but argued that the detective acted in bad faith. *Id.* ¶ 23. This court found on appeal that the experienced detective did act in bad faith when he deliberately destroyed his notes after receiving the subpoena for them, specifically noting that his testimony that "he believed them to be his personal notes was disingenuous at best and blatantly untrue at worst." *Id.* ¶ 25. We fail to see the parallels between the facts in *Sandridge* and those in this case. Here, contrary to the circumstances in *Sandridge*, the record does not indicate that the oral swabs were deliberately destroyed with knowledge of the pending criminal proceedings in this case. Again, as the State noted before the trial court, the oral swabs were not correctly labeled and were inadvertently released from a hold and destroyed as part of a routine purging procedure.

¶ 67 We also find defendant's reliance on *People v. Walker*, 257 Ill. App. 3d 332 (1993), to be misplaced. There, the State appealed from the trial court's declaration of a mistrial and dismissal of the indictment based on a due process violation. *Id.* at 335. The State argued that there was no showing of bad faith on the part of the police. *Id.* The record showed that the police destroyed material evidence six weeks after the defendant's arrest and eight months prior to trial. *Id.* at 335. The appellate court affirmed the trial court's judgment, finding that the police acted in bad faith based on the quick destruction of the evidence, which was in violation of normal police procedure regarding evidence. *Id.* at 335-36. Additionally, the court noted that the evidence was central to the defendant's misidentification defense, and the State used testimony regarding the lost evidence in order to convict the defendant. *Id.* Here, the oral swabs were mistakenly destroyed several years after the murder and almost a year after defendant was arrested for the murder. The lack of temporal proximity minimizes any potential inference of bad faith. Moreover, unlike in *Walker*,

the oral swabs were not used against defendant at any point during the trial. Thus, we find both of the cases which defendant cites for support inapposite.

¶ 68    Because defendant cannot establish the bad faith element, his underlying claim of a due process violation would not have been successful even if appellate counsel had raised it on direct appeal. See *Sutherland*, 223 Ill. 2d at 236-37 (unless a defendant can show bad faith, the failure to preserve potentially useful evidence is not a denial of due process). Therefore, appellate counsel was not arguably ineffective for failing to raise that claim.

¶ 69                                2. Ineffective Assistance of Trial Counsel

¶ 70    Defendant's next underlying claim is that trial counsel was constitutionally ineffective for eliciting testimony that bolstered the State's case and was damaging to defendant's alibi defense during closing argument.

¶ 71    As we have stated, the Sixth Amendment right to counsel is the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In determining whether a defendant was denied his right to effective assistance of counsel, we employ the well-known two-prong test set forth in *Strickland* and adopted by Illinois courts in *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984). To satisfy the test, a defendant must establish that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by counsel's deficient performance. *People v. Hall*, 217 Ill. 2d 324, 335 (2005). "Because a defendant must satisfy both prongs of the *Strickland* test to prevail, the failure to establish either precludes a finding of ineffective assistance of counsel." *People v. Cherry*, 2016 IL 118728, ¶ 24.

¶ 72    Defendant specifically asserts that trial counsel erred in two ways. First, counsel introduced medical testimony that allowed for the inference that the victim could have been killed before the time covered by his alibi, and second, during closing arguments, counsel abandoned defendant's

alibi defense and argued that the murder occurred earlier in the morning, which implicated defendant in the murder.

¶ 73    In response, the State contends that defendant was not prejudiced by trial counsel eliciting testimony on rigor mortis and arguing that the victim was killed in the "early morning hours." In particular, the State points out that defendant's characterization of trial counsel's argument is rebutted by the record where counsel actually argued that the victim was killed in the early hours in her own home by her boyfriend. Thus, according to the State, defendant's claim has no arguable basis in fact. Additionally, the State contends that the rigor mortis evidence counsel elicited was cumulative of the same evidence regarding rigor mortis that the State presented.

¶ 74    Because we find that the prejudice prong is dispositive of defendant's claim, we need not discuss whether counsel's performance was reasonable. See *People v. Graham*, 206 Ill. 2d 465, 476 (2003) (stating that we do not need to consider the first prong when the second prong cannot be satisfied). To demonstrate prejudice, a defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 695. A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶ 75    Based on a review of the record, we must conclude that defendant cannot establish prejudice due to the nature and quantity of evidence supporting the jury's guilty verdict. At trial, the State presented the videorecording of defendant's interview with the detectives, which showed defendant confessing to having sex with the victim on the day of her death, being scratched by the victim, and choking her until she lost consciousness. This confession was corroborated by the other evidence presented. To wit, defendant's DNA was found under the victim's fingernails, the

victim's death was caused by strangulation, and defendant's ex-wife testified that she had observed scratch marks on him at one time.

¶ 76    Further, the evidence presented in support of defendant's alibi was weak in comparison. For instance, the defense suggested that defendant's confession was coerced or involuntary in some way. Defendant testified that he was very tired during the interview and he was late in receiving his diabetes medication. However, this was belied by the videorecording of the interview, during which defendant was offered food and water and the detectives asked him if he was doing okay multiple times. They also specifically asked about his diabetes medication and his response did not convey any sense of urgency. At no point did defendant state to the detectives that he was tired nor did his demeanor affirmatively suggest that he was too tired to be interviewed.

¶ 77    Defendant also asserted that he could not have murdered the victim because he was at home when his wife woke up that morning and he drove her to work. However, his ex-wife testified that she could not specifically recall that morning. Additionally, the State's investigator's testimony established that defendant had sufficient time to drive home from the location where the victim was found in time to drive his wife to work and make it to the toll plazas at the times reported on his I-PASS account.

¶ 78    Lastly, we agree with the State that defense counsel's alleged deficient performance was not prejudicial because the testimony elicited was cumulative of that presented by the State. On direct examination, Dr. Eckhardt testified that rigor mortis could take between 6 and 12 hours to settle in but the process could start within 30 minutes of death. He further testified that the timing could be affected by the temperature or whether someone was in physical stress at the time of death. On cross-examination, Dr. Eckhardt reiterated the same information regarding rigor mortis. Later, defense counsel called the ambulance commander, Caraballo, as a witness, and he testified

that rigor mortis generally sets in after a couple of hours after death but every individual might differ. On cross-examination, he confirmed that he did not have the same training as a medical examiner but he agreed that freezing temperatures could cause muscles to stiffen. In sum, the State had already elicited testimony from Dr. Eckhardt that temperature could slow down the process of rigor mortis. None of defense counsel's examination of Dr. Eckhardt or Caraballo added any new information regarding the timing of the victim's murder. Thus, we cannot say that the absence of counsel's cumulative examination would have changed the outcome of the trial. See *Enis*, 194 Ill. 2d 361, 411-13 (2000) (rejecting the defendant's claim that his attorney was ineffective for failing to provide certain evidence where that evidence was cumulative of information that had already been presented to the court); *People v. Smith*, 195 Ill. 2d 179, 190-91 (2000) (finding that the defendant could not satisfy the prejudice prong because defense counsel was not ineffective when he failed to call a witness to provide cumulative testimony).

¶ 79    For these reasons, defendant cannot show that trial counsel's performance was prejudicial to him. Accordingly, because trial counsel was not ineffective, neither was appellate counsel.

¶ 80    Because we have concluded that defendant's underlying issues lack merit, defendant cannot show that he was arguably prejudiced by appellate counsel's failure to raise these claims on appeal. *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Accordingly, the trial court properly dismissed defendant's initial postconviction petition where it did not state the gist of a constitutional claim.

¶ 81                                        III. CONCLUSION

¶ 82    For the reasons stated, we affirm the judgment of the circuit court.

¶ 83    Affirmed.